IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION


FILED
JUL 21 2016
Clerk, U.S. District Court
District Of Montana
Billings

| UNITED STATES OF AMERICA, | CR 16-13-BLG-SPW |
| --- | --- |
| Plaintiff, | |
| vs. | |
| TAWNYA BEARCOMESOUT, | ORDER |
| Defendant. | |

Before the Court is Defendant Tawnya Bearcomesout's Motion to Dismiss the Indictment based on Double Jeopardy. (Doc. 25) Bearcomesout argues that the Northern Cheyenne Tribe and the United States are no longer separate sovereigns, so her prosecution in the Northern Cheyenne Tribal Court and her prosecution in this Court are derived from the same source, in violation of the Fifth Amendment's Double Jeopardy Clause. The government argues that the Double Jeopardy Clause does not apply. For the reasons set forth below, the Court DENIES Bearcomesout's motion.

1

## I. Background

On February 19, 2016, Bearcomesout was charged by Indictment with voluntary manslaughter and involuntary manslaughter, in violation of 18 U.S.C. §§ 1153(a) and 1112(a). Prior to the federal Indictment, the Northern Cheyenne Tribal Court charged and sentenced Bearcomesout with crimes arising out of the same events. Bearcomesout accepted an *Alford* plea in tribal court. She was sentenced to one year of incarceration with the Bureau of Indian Affairs Law Enforcement Services and a $5,000 fine for the charge of homicide as well as an additional one-year sentence and $2,000 fine for the charge of assault, with both periods of incarceration to run consecutively. (Doc. 26-1 at 1-2).

## II. Legal Standard

The Double Jeopardy Clause of the Fifth Amendment provides an individual with three forms of protection: (1) it prohibits a second prosecution for the same offense after acquittal, (2) it prohibits a second prosecution for the same offense after conviction, and (3) it prohibits multiple punishments for the same offense. *See United States v. Enas*, 255 F.3d 662, 665 (9th Cir. 2001). One notable exception to those prohibitions, however, is the Dual Sovereignty Clause which allows successive prosecutions by separate sovereigns. *Id.* at 666-67. The basis for this exception is that prosecutions under the laws of separate sovereigns do not, in

2

the language of the Fifth Amendment, "subject [the defendant] for the same offence to be twice put in jeopardy." *United States v. Wheeler*, 435 U.S. 313, 316-17 (1978).

To determine whether two prosecuting authorities are independent sovereigns for Double Jeopardy purposes, the court must ask a "narrow, historically focused question." *Commonwealth of Puerto Rico v. Sanchez Valle*, 136 S.Ct. 1863, 1867 (2016). "The inquiry does not turn, as the term 'sovereignty' sometimes suggests, on the degree to which the second entity is autonomous from the first or sets its own political course. Rather, the issue is only whether the prosecutorial powers of the two jurisdictions have independent origins—or, said conversely, whether those powers derive from the same 'ultimate source.'" *Id.* at 1867 (*quoting Wheeler*, 435 U.S. at 320).

In *Wheeler*, the Supreme Court outlined a baseline assumption that while Indian tribes exercise their independent sovereignty "only at the sufferance of Congress," the tribes retain their existing sovereign powers "until Congress acts" to eliminate or control them. 435 U.S. at 323; *see also United States v. Lara*, 541 U.S. 193 (2004) (holding that the Civil Rights Act of 1968 § 201(2), as amended, 25 U.S.C.A. § 1301(2), amounted to a federal *acknowledgement* (as opposed to the source) of the Spirit Lake Tribe's inherent sovereign power to prosecute and

3

punish offenders, thus rendering a Double Jeopardy challenge impermissible). With respect to prosecutorial powers, the Court stated that because a tribe's power to enforce tribal law springs from "retained tribal sovereignty," it is "undisputed that Indian tribes have power to enforce their criminal laws against tribal members." *Wheeler*, 435 U.S. at 322; *see also Duro v. Reina*, 495 U.S. 676 (1990) ("The power of a tribe to prescribe and enforce rules of conduct for its own members 'does not fall within that part of sovereignty which the Indians implicitly lost by virtue of their dependent status.'").

## III. Discussion

### A. Tribal Sovereignty

Citing decades of "schizophrenic" case law, Bearcomesout argues that the law has evolved such that the Northern Cheyenne Tribe's concept of self-governance and sovereignty has disappeared. As a result, Bearcomesout argues that the Tribe is "subject to the external whim of the United States" which inherently extinguishes the tribe's sovereignty. Because the Tribe is not sovereign, Bearcomesout argues that her prosecution in Northern Cheyenne Tribal Court was in essence a federal prosecution, in violation of the Double Jeopardy Clause.

The obvious disagreement about the state of tribal sovereignty among Supreme Court justices contained in various dissents and concurrences over the

years unquestionably creates uncertainty and doubt about whether the term "independent sovereign" still appropriately applies to Indian tribes. Nevertheless, as recently as June of this year, the Supreme Court reaffirmed the rule from *Wheeler* and its progeny that tribal sovereignty continues to exist, at least as it relates to Double Jeopardy, stating:

> Indian tribes [] count as separate sovereigns under the Double Jeopardy Clause. Originally, this Court has noted the tribes were self-governing sovereign political communities, possessing (among other capacities) the inherent power to prescribe laws for their members and to punish infractions of those laws. After the formation of the United States, the tribes became domestic dependent nations, subject to plenary control by Congress—so hardly "sovereign" in one common sense. But unless and until Congress withdraws a tribal power—including the power to prosecute—the Indian community retains that authority in its earliest form. The ultimate source of a tribe's power to punish tribal offenders thus lies in its "primeval" or, at any rate, "pre-existing" sovereignty: A tribal prosecution, like a State's, is attributable in no way to any delegation of federal authority. And that alone is what matters for the double jeopardy inquiry.

*Sanchez Valle*, 136 S. Ct. 1863, 1872 (2016) (internal quotation marks and citations omitted).

Bearcomesout argues that the Tribe gave away any sovereignty it may have inherently possessed in the Northern Cheyenne Constitution (NCC). (Doc 26 at 12; Doc. 31 at 4). Noting the general requirements for approval by the Secretary of the Interior throughout the NCC, Bearcomesout points specifically to Art. IV, § 1(i) of

5

the NCC which sets out one of many of the enumerated powers the Tribal Council will exercise under the NCC:

> "To promulgate and enforce ordinances, which shall be subject to review by the Secretary fo (sic) the Interior, governing the conduct of members of the Northern Cheyenne Tribe and any other person or persons coming within the jurisdiction fo (sic) the reservation, and providing for the maintenance of law and order and the administration of justice by establishing a reservation court and defining its duties and power."

Bearcomesout argues that the general requirements demonstrate that the federal government, through its review and approval power, dictates the management of all Tribal functions. She further argues that by acquiescing to federal government review and approval power over prosecutions, the Tribe has no prosecutorial sovereignty.

As Bearcomesout acknowledges, however, tribes remain sovereign for purposes of the Double Jeopardy Clause until Congress chooses to withdraw the plenary power it has. *See Sanchez Vallez*, 136 S.Ct at 1869; *Wheeler*, 435 U.S. at 323 ("the sovereignty that the Indian tribes retain . . . exists only at the sufferance of Congress . . . But until Congress acts, the tribes retain their existing sovereign powers."); *see also Lara,* 541 U.S. 193, 200 (2004) (J. Thomas concurring) ("Congress . . . can regulate virtually every aspect of the tribes without rendering tribal sovereignty a nullity.") And, for the purposes of the Double Jeopardy analysis,

6

the Court unequivocally stated that it does not examine the "extent of control" that "one prosecuting authority wields over the other," or the "degree to which an entity exercises self-governance – whether autonomously managing its own affairs or continually submitting to outside direction[.]" *Sanchez Valle*, 136 S.Ct at 1870. So at base, it doesn't matter whether the Tribe gives the power to review ordinances to the Secretary of the Interior, or whether the Tribe "possesses the usual attributes, or acts in the common manner, of a sovereign entity." *Id*. The only element that matters for the Double Jeopardy analysis is the "ultimate source" of the power "undergirding the respective prosecutions." *Id*. The Court has already answered that question: the tribe's prosecutorial sovereignty is inherent. *Wheeler*, 435 U.S. at 323-24.

Accordingly, and perhaps illogically, the Tribe's decision to intentionally subject its governance to the oversight of the Secretary of the Interior has no bearing on the Tribe's sovereignty with respect to prosecutions. *See Duro v. Reina*, 495 U.S. 676, 686, 110 S. Ct. 2053, 2060, 109 L. Ed. 2d 693 (1990) (holding that a tribe's power to manage its internal affairs for its members "does not fall within that part of sovereignty which the Indians implicitly lost by virtue of their dependent status.") Thus, while Bearcomesout's argument is logical, persuasive, and buttressed by significant legal analysis, it provides the Court with no authority to rule against such a firmly rooted line of precedent.

7

## B. The *Barktus* Exception

Bearcomesout also argues that the United States violated the Double Jeopardy Clause when it dominated her prosecution in the Northern Cheyenne Tribal Court in violation of *Bartkus v. People of the State of Illinois*, 359 U.S. 121, 123-24 (1959). In *Bartkus* the Supreme Court suggested that the dual sovereignty doctrine might be overcome if one jurisdiction was acting as a "tool" of another, or if a state prosecution was "a sham and a cover for a federal prosecution." *Id.* at 124. The Ninth Circuit recognizes this exception as the so-called *Bartkus* exception. *See United States v. Bernhardt*, 831 F.2d 181, 182 (9th Cir. 1987).

Importantly, *Bartkus* does not prohibit "very close coordination in the prosecutions, in the employment of agents of one sovereign to help the other sovereign in its prosecution, and in the timing of the court proceedings so that the maximum assistance is mutually rendered by the sovereigns . . . . No constitutional barrier exists to this norm of cooperative effort." *United States v. Figueroa–Soto*, 938 F.2d 1015, 1020 (9th Cir.1991) (internal citations omitted); *see also Bernhardt*, 831 F.2d at 182 ("It is clear that the *Bartkus* exception does not bar cooperation between prosecuting sovereignties.").

Bearcomesout's *Bartkus* argument circles back to her argument regarding tribal sovereignty. That is, she argues that because the Tribe receives federal funding

8

and regulatory oversight by the Secretary of the Interior, the Tribe is a "de facto arm of the federal government." (Doc. 31 at 3). Bearcomesout further contends that by accepting the Secretary of the Interior's oversight, through its review and approval power of the Northern Cheyenne's Constitution, the Tribe has given away its sovereignty, particularly with respect to prosecutions. The result, according to Bearcomesout, is that the Tribe is a "subject political entity" of the federal government, which meets the level of collusion necessary to meet the *Bartkus* exception. *Id.* at 3. As noted above, the question of whether tribes maintain sovereignty with respect to prosecutions was addressed, and answered in the affirmative, in *Sanches Valle*.

Furthermore, although the financial and regulatory relationship between tribal authorities and the federal government may be significant, this mutual cooperation does not mean the Tribe has given away its sovereignty or made itself a tool of the federal government as required under the *Bartkus* exception. The burden of establishing sufficient federal manipulation or control is "substantial; the [defendant] must demonstrate that the state officials had little or no independent volition in the state proceedings." *Zone*, 403 F.3d at 1105 (quoting *United States v. Liddy*, 542 F.2d 76, 79 (D.C. Cir. 1976)).

9

Here, the central funding and pooling of investigatory power between the federal government and the tribe is not unique. Cooperation between a tribal entity and the federal government does not automatically make one a "tool" of the other. *See generally Figueroa–Soto*, 938 F.2d 1015. As the Government notably argues, while investigative agencies for the federal government and the Tribe cooperated closely with each other here, "the ultimate decision making authority on whether to charge a case or seek an indictment rested solely with the prosecuting agencies." (Doc. 30 at 6).

Bearcomesout provides the Court with only conclusory allegations and no specific evidence that the Tribe had "little or no independent volition" in the Bearcomesout's tribal prosecution. *Zone*, 403 F.3d at 1105. Accordingly, she does not meet the standard for an evidentiary hearing. *See United States v. Koon*, 34 F.3d 1416, 1439 (9th Cir. 1994) (To qualify for an evidentiary hearing, a defendant must, at the very least, "make more than 'conclusory allegations' of collusion.") Based on the evidence before the Court, Bearcomesout has not shown the *Bartkus* exception applies.

## IV. Conclusion

For the reasons stated above, Bearcomesout's Motion to Dismiss (Doc. 25) is DENIED.

DATED this 22nd day of July, 2016.

*signature*
SUSAN P. WATTERS
United States District Judge